**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

DAVID BILODEAU and ELIZABETH DUDLEY, Individually and as representatives of a Class of Participants and Beneficiaries of the Verizon Savings Plan for Management Employees,

Plaintiffs,

Case No: 1:25-cv-07057-AS

v.

VERIZON COMMUNICATIONS, INC.; BOARD OF DIRECTORS OF VERIZON COMMUNICATIONS, VERIZON EMPLOYEE BENEFITS COMMITTEE,

Defendants.

# AMENDED CLASS ACTION COMPLAINT

Plaintiffs David Bilodeau and Elizabeth Dudley ("Plaintiffs"), individually and as representatives of a Class of Participants and Beneficiaries of the Verizon Savings Plan for Management Employees (the "Verizon Plan" or "Plan"), by their counsel, WALCHESKE & LUZI, LLC and CHIRINOS LAW FIRM, PLLC, as and for a claim against Defendants, alleges and asserts to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1. The Employee Retirement Income Security Act ("ERISA") requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and

to refrain from "deal[ing] with the assets of the plan" in its own interest. 29 U.S.C. §§ 1104(a)(1), 1106(a)(1)(D), 1106(b)(1).

2. Plaintiffs bring this ERISA action on behalf of the Verizon Plan under 29 U.S.C. § 1132(a)(2) and Rule 23 of the Federal Rules of Civil Procedure as representatives of a class of participants and beneficiaries of the Plan, against Defendants Verizon Communications, Inc. ("Verizon"), the Board of Directors of Verizon Communications, Inc. ("Board"), and the Verizon Employee Benefits Committee ("Plan Committee") (collectively "Defendants"), for breaching their fiduciary duties and engaging in prohibited transactions with regard to the Verizon Plan.

3. As detailed below, instead of prudently evaluating how to best deploy plan assets that had been forfeited by departing Plan participants, Defendants instead reflexively and exclusively used those forfeitures to benefit Verizon, to the detriment of the Plan and its participants, by applying over $152 million of Plan forfeitures to offset Verizon's contractual obligations to make declared matching contributions to the Plan between 2019-2023, while not using any forfeitures to defray Plan expenses. Defendants' unconsidered decision to exclusively use Plan forfeitures to benefit Verizon resulted in Plan participants paying over $49 million in Plan expenses from 2019 to 2023 to the Plan's third-party service providers, both directly and indirectly, that should have been completely defrayed or substantially reduced by Plan forfeitures. Even more egregious, during the class period the Plan had millions of dollars of leftover forfeitures available at the end of each year that Defendants could have used to defray all of the Plan's expenses even *after* they enriched Verizon with over $152 million in Plan assets.

## **JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*.

5. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

6. Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

**PARTIES**

7. Plaintiff David Bilodeau is a resident of the State of Texas, and during the Class Period was a participant in the Verizon Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

8. Plaintiff Elizabeth Dudley is a resident of the State of Idaho, and during the Class Period was a participant in the Verizon Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

9. Plaintiffs have Article III standing to bring this action on behalf of both the Verizon Plan because they suffered actual injuries-in-fact through the misallocation of Plan forfeitures by Defendants with regard to the Verizon Plan during the Class Period by not having Plan forfeitures utilized to pay at least some of their Plan administrative expenses. Those injuries are fairly traceable to Defendants' unlawful conduct in using Plan forfeitures for their own benefit through reduced employer contributions, and those harms are likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiffs and to the Class.

10. Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), on behalf of the Verizon Plan and for relief that sweeps beyond their own injuries.

11. The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the misallocation of Plan forfeitures) necessary to understand

that Defendants breached their fiduciary duties and engaged in prohibited transactions until shortly before this suit was filed.

12. Having never managed a very large 401(k) plan, Plaintiffs, and all participants in the Plan, lacked actual knowledge of how Plan forfeitures should be allocated.

13. Verizon Communications, Inc. ("Verizon") is one of the largest companies in the world. According to Fortune Magazine, in 2015, Verizon was the fifteenth largest company in the United States and the forty-second largest company in the world as measured by annual revenue. Verizon maintains its principal place of business in New York, New York, at 1095 Avenue of the Americas, New York, NY 10036. In this Complaint, "Verizon" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

14. Verizon acted through its officers, including its Board of Directors and Plan Committee, to perform Plan-related fiduciary functions in the course and scope of their business. Under Section 10.02 of the Verizon Savings Plan for Management Employee, amended and restated, January 1, 2022 ("Plan document"),[1] Verizon and its Board appointed other Plan fiduciaries to the Verizon Plan, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Verizon and its Board are fiduciaries of the Verizon Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

15. Under Sections 1.01(yy), 10.01, 10.02, and 10.07, of the Plan Document, the Verizon Employee Benefits Committee ("Plan Committee") is the Plan Administrator with day-to-day administration and operation of the Verizon Plan under 29 U.S.C. § 1002(21)(A). The Plan Committee has authority and responsibility for the control, management, and administration of

[1] The Plan Document is attached hereto in its entirety as **Exhibit 1**.

the Verizon Plan in accordance with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

16. With 125,451 participants and $27,825,640,157 in assets under management as of December 31, 2023, the Verizon Savings Plan for Management Employees is one of the largest retirement plans in the country. It ranks in the top 0.01% of over 730,629 retirement plans in terms of the number of participants and the top 0.001% of plans in terms of the value of its assets.

17. From 2019 to 2024, Verizon's annual revenue has ranged from approximately $128.29 billion to $136.84 billion. In turn, Verizon's profit over the last six years varied, with net income varying between $11.6 billion (2021) and $21.3 billion (2023).

**ERISA'S PURPOSE AS APPLIED TO DEFINED CONTRIBUTION PLANS**

18. ERISA exists, in large part, to protect the interests of participants, and their beneficiaries, in employee retirement plans. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (citing 29 U.S.C. § 1001(b)).

19. Over the past several decades defined contribution plans, like the Verizon Plan, have become the primary savings vehicle for most Americans. By 2022, there were more than 121 million participants who were relying on benefits from defined contribution plans to provide some or all of their retirement benefits. *See* https://www.congress.gov/crs-product/R48470; *LaRue v. DeWolff, Boberg & Assocs*., 552 U.S. 248, 255 (2008) ("Defined contribution plans dominate the retirement plan scene today.").

20. Defined contribution plans allow employees to defer the payment of taxes on compensation contributed to the Plan. As a result, there are many IRS rules and regulations that define

the requirements a plan must follow in order to receive the benefit of deferring taxes on contributions. To the extent that employers agree to make contributions to defined contribution plans, the employers also receive a tax benefit.

21. A defined contribution plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34). As such, a participant's retirement account in a defined contribution plan equals (1) the amount of the participant's voluntary contributions; plus (2) the amount of any employer contributions; plus (3) any investment returns on those contributions; minus (4) plan and investment expenses paid to third-party service providers. *Cunningham v. Cornell Univ.*, 604 U.S. 693, 697-98 (2025) (explaining that defined contribution participants "maintain individual investment accounts within those plans, the value of which is determined by the market performance of employee and employer contributions, less expenses. Those expenses include fees paid to service providers.").

22. In addition, employers, like Verizon, also derive many other indirect benefits by virtue of sponsoring defined contribution plans. For example, in addition to tax benefits, retirement plans are critical tools for employers to attract and retain high quality employees. That is why plan sponsors rarely terminate plans or eliminate contributions to their plans, because doing so would put them at a substantial competitive disadvantage and make it much more difficult to attract and retain talented employees

23. As relevant to this case, under the circumstances prevailing well prior to the class period, it was and is understood that it is in the best interest of plan participants to enable them to participate in the potential for market earnings sooner rather than later. That general understanding

applies to both contributions from employees as well as the allocation of forfeited plan assets and employer contributions.

24. For example, ERISA and DOL regulations reflect a clear and longstanding policy intent to ensure that contributions of Plan participants are promptly invested pursuant to the direction of each Plan participant and are not allowed to sit indefinitely in unallocated plan-level accounts, which are typically invested in cash or a cash equivalent thereby depriving plan participants from the potential for investment earnings. *See, e.g.*, DOL Advisory Opinion 2002-02A (requiring that plan fiduciaries minimize the time between employee deferrals and investment pursuant to plan participant direction); see also 29 C.F.R. § 2510.3-102 (noting that plan assets "include participant contributions as of the earliest date they can reasonably be segregated" from the employer's general assets); DOL Field Assistance Bulletin 2008-01 (noting that participant contributions "that are withheld from wages or paid to the employer are delinquent if they become plan assets while still in the hands of the employer").[1]

25. Additionally, as relevant to this case, under the circumstances prevailing well prior to the class period, it was and is understood that plan expenses can have a dramatic detrimental impact on the retirement benefits provided by defined contribution plans. For example, according

[1] *See also*, IRS "Retirement News for Employers," Vol. 7, Spring 2010 (stating forfeitures "must be used or allocated in the plan year incurred. The Code does not authorize forfeiture suspense accounts to hold unallocated monies beyond the plan year in which they arise."); 29 C.F.R. § 2510.3-102 (61 Fed. Reg. 41220, Aug. 7 1996) (noting that "the Department is concerned that participant contributions be paid promptly into the plan so as to begin to earn interest or other investment returns and to be available for the payment of benefits."); Field Assistance Bulletin No. 2002-03 (noting concern about interest earned "on contributions pending investment direction" and requiring that float be "regarded by plan fiduciaries and service providers as part of the service provider's compensation"). Accordingly, interest (float) earned on Forfeited Plan Assets sitting in an unallocated plan-level account both inures to the benefit of the employer when the plan fiduciaries use that interest (float) to reduce the employer's contributions and also deprives plan participants of the potential for investment earnings.

to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement.[2] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000.[3]

## ERISA FIDUCIARY STANDARDS

26. ERISA imposes strict duties of loyalty and prudence upon fiduciaries of retirement plans, like the Verizon Plan, that are covered by ERISA.

27. Defendants are required by ERISA to: "discharge [their] duties with respect to a plan ***solely*** in the interest of the participants and beneficiaries and – (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A), (B) (emphasis added).

28. ERISA explicitly requires plan fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

29. ERISA's fiduciary duties are the "highest known to the law," *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006).

30. "[C]onflicts of interest can violate ERISA's loyalty requirement." *Pilkington PLC v. Perelman*, 72 F.3d 1396, 1401 (9th Cir. 1995).

---

[2] U.S. Dept. of Labor *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf.

[3] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/, *archived at*https://perma.cc/8VCU-E7PC.

31. The duty of prudence imposed by 29 U.S.C. § 1104(a)(1) focuses on the thoroughness of a fiduciary's investigation before making a decision and asks "whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular" decision. *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 107 (2d Cir. 2021).

32. A fiduciary's decision-making process is always evaluated based on "the circumstances then prevailing", *i.e.,* the facts the fiduciaries knew at the time or should have known had they employed a prudent process. 29 U.S.C. § 1104(a)(1)(B).

33. "[A] claim for breach of the duty of prudence will survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed or that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Sacerdote,* 9 F.4th at 108.

34. Additionally, ERISA makes explicit that the fiduciary duties set forth above cannot be overridden by plan terms, stating that fiduciaries must follow plan terms *only* "insofar" as they are "consistent with the provisions of this subchapter and subchapter III." 29 U.S.C. § 1104 (a)(1)(D).

35. The Supreme Court warns ERISA fiduciaries that they are not immunized from their duties to plan participants when they purport to adhere to a plan document. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) (explaining that compliance with a plan document does not necessarily mean a fiduciary has discharged its duties with the prudence required under ERISA).

36. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for, among other things, knowingly participating in a breach by another fiduciary or enables breaches by other fiduciaries.

37. Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

38. Accordingly, the Plan Committee is a fiduciary because it is the Plan's Administrator (named fiduciary), vested with authority to manage and administer the Plan, and because it exercised discretionary authority with respect to allocating Plan forfeitures at issue here.

39. Verizon and its Board are fiduciaries with respect to the appointment and monitoring of the Plan Committee because it appointed the Plan Committee as Administrator and retained responsibility for monitoring the Plan Committee.

40. Verizon is also a party-in-interest because it is an employer "any of whose employees are covered by such plan." *Id.*, § 1002(14)(C).

41. Because Defendants are fiduciaries of the Plan and "deal[t] with the assets of the plan in [their] own interest or for [their] own account," they violated the fiduciary duty of loyalty and engaged in prohibited transactions under both 29 U.S.C. § 1106(a)(1)(D) and 29 U.S.C. § 1106(b)(1), by benefiting themselves as far as reducing their own future contributions to the Verizon Plan, making it unnecessary to take money out of their corporate revenues to support the Plan.

## **STATEMENT OF FACTS**

42. Plaintiffs are both "participants" in defined-contribution plans under ERISA Section 3(7), 29 U.S.C. § 1002(7): the Verizon Savings Plan for Management Employees.

43. The Plan is a defined contribution plan pursuant to 29 U.S.C. §§ 1002(2)(A) and (34) and was created by Verizon exclusively for its employees and the "assets of the Plan . . . shall

be held for the exclusive benefit of the members and their beneficiaries . . . ." Exhibit 1 at Section 11.01.

44. The Plan was created and funded several years prior to the class period.

45. In accordance with 29 U.S.C. § 1103(a), the assets of the Plan are held in a trust fund "for the purpose of holding the assets of and funding the benefits provided by the Plan."

46. As an individual account, defined contribution retirement plan, a participant's retirement benefit in the Plan equals (1) the amount of the participants' voluntary contributions; *plus* (2) the amount of any employer contributions; *plus* (3) any investment returns on those contributions; *minus* (4) plan and investment expenses.

47. As the employer and sponsor of the plan (also known as the settlor as that meaning is understood from trust law and used by the DOL in guidance), Verizon drafted and amended the Plan and intended it comply with the requirements of ERISA and the Internal Revenue Code of 1986, as amended.

48. The Plan is funded by a combination of wage withholdings by Plan participants and Company contributions, each of which is deposited into the Plan's trust funds.

49. Each participant's account is credited with the participant's (1) their own salary deferral contributions; (2) company matching contributions; (3) employer profit-sharing contributions; (4) Plan earnings; and (5) forfeitures of terminated participants' non-vested accounts.[4]

[4] Under Section 1.01(o) of the Plan document, "Company-Matching Contributions" shall mean the amount that the Company and the Participating Affiliates contribute to the Profit-Sharing Plan pursuant to Section 3.03 . . . , and the amount of any forfeitures that are allocated to Members' Accounts on the basis of their Matched Elective Contributions or Matched After-Tax Contributions." Ex. 1, § 1.01(o). In turn, an "Elective Contribution" shall mean a contribution to the Plan by the Company or a Participating Affiliate equal to the amount of Compensation that a Member elects to forgo pursuant to a Compensation Deferral Agreement. A Member's "Elective Contribution" shall be the sum of his Matched Elective Contribution and his Unmatched Elective Contribution. *Id*, § 1.01(w). On the other hand, "Profit Sharing Contribution" shall mean the amount that

50. Participants in the Verizon Plan are fully and immediately vested with regard to their own contributions and earnings thereon to their individual accounts in the Verizon Plan.

51. Verizon typically makes the settlor decision about the amount of Company Contributions sometime in the fourth quarter of a plan year or very early in the beginning of the next plan year.

52. Under Section 4.01(a) of the Plan Document, a Plan participant is "fully vested at all times in his Elective Contributions, After-Tax Contributions, Rollover Contributions, and Transfer Contributions (if any), and any Income thereon."

53. Under Section 4.01(c) of the Plan Document, "a Member shall be fully vested in the Company-Matching Contributions allocated to his Member's Account . . ., and any Income thereon upon completing three years of Vesting Service." *Id.,* § 4.01(c).

54. Upon their deposit into the Plan's trust funds, all participant contributions and company contributions become assets of the Plan.

55. Under Section 4.02 of the Plan Document, "[a] Member who is not 100% vested in all amounts allocated to his Member's Account . . . shall forfeit the nonvested portion of his Member's Account . . . as soon as administratively practicable after his Termination Date."

56. In turn, under Section 4.04 of the Plan Document, "any amounts forfeited in accordance with Section 4.02 shall be applied to reduce Company-Matching Contributions and/or any Profit Sharing Contributions to the Plan for the current Plan Year or the Plan Year next following the Plan Year in which the forfeiture occurred **<u>or</u>** shall be used to pay Plan expenses in accordance with Section 10.11(d)." (emphasis added).

---

the Company and the Participating Affiliates contribute to the Profit-Sharing Plan pursuant to Section 3.12 . . ., including any forfeitures that are allocated to Members' Accounts to offset such contributions." *Id.*, § 1.01(ccc).

57. The use of the word "or" imbues this Plan language with discretion. So, when the time came to actually exercise the discretion provided by the Plan, to determine whether forfeitures would be allocated toward Plan administrative expenses or toward reducing Verizon's contributions, those decisions were made in a fiduciary capacity.

58. In pertinent part, Section 10.11(d) states: "Any remaining expenses of administering the Plan, including the fees and expenses of the Trustee, shall be paid from the Trust except to the extent that such expenses are paid by the Company . . . . *Expenses paid from the Trust shall be paid from forfeitures allocable under Section 4.04 . . ., and, to the extent not paid from such forfeitures, shall be paid from the Trust and allocated to some or all of the Funds on a pro rata basis*." (emphasis added).

59. Under Section 10.11(a) of the Plan Document dealing with Plan expenses, "[t]he Plan Administrator may from time to time establish periodic 'account maintenance fees' for expenses related to a Member's Accounts under the Plan. The account maintenance fees, if any, shall be debited from the Accounts of a Member in the manner determined by the Plan Administrator."

60. Read together, Sections 10.11(a) and 10.11(d) mean that although the Plan Committee is permitted to charge expenses to the administering the Plan to participants in the form of "account maintenance fees," the Plan Committee thereafter has a discretionary decision as to whether to use Plan forfeitures to relieve Plan participants of some or all Plan expenses or to use that money for reducing Verizon's various employer contributions to the Plan.

61. The November 2024 Plan Participant Fee Disclosure further explains that "Plan administrative fees may include legal, accounting, trustee, recordkeeping, and other administrative fees and expenses associated with maintaining the Plan. Some Plan administrative fees are paid

through an annual recordkeeping fee that is deducted from each participant's Plan account. The annual fee is $23 per year. One-fourth of the annual fee ($5.75) is deducted each quarter, but any remaining quarterly installments will be immediately deducted if you take a full distribution during the year. The recordkeeping fee is deducted on a pro rata basis from all funds in which you are invested. Remaining Plan administrative fees that are paid by the Plan are charged to the Tier 1 and Tier 2 investment options. These remaining fees are included in determining the asset-based fees of each affected investment option. Plan administrative fees may be reduced by credits provided by the Plan trustee/record keeper for the net float income it earns with respect to the Plan."

62. Verizon must "forfeit the nonvested portion of . . . Member's Account . . . as soon as administratively practicable after [the] Termination Date."

63. Unless Defendants choose to allocate the forfeitures to "pay Plan expenses," the Plan's administrative expenses are charged to the Plan participants' accounts. Both Plaintiffs paid administrative expenses out of their Plan accounts because Verizon discretionarily decided to reduce future company contributions rather than reduce or eliminate any Plan expenses on their behalf as permitted under the Plan.

64. Before January 1, 2024, there was no priority as far as how to allocate Plan forfeitures for the permitted use. The Plan Committee had a discretionary decision to make as far as whether to use the Plan forfeitures to reduce the Plan expenses for participants or to reduce company-matching contributions.

65. Prior to January 1, 2024, the Plan Committee reflexively and exclusively favored Verizon by reducing their contributions to the Plan rather than paying any Plan expenses for employees.

66. Effective January 1, 2024, Verizon, through the Second Amendment to the Plan Document, expressly provided that it was amending the Plan to, among other reasons, "provide that forfeitures shall be **first** applied to reduce Company-Matching Contributions." *See* Second Amendment to Plan Document, attached hereto as **Exhibit 2** (emphasis added), meaning that there was no forfeiture allocation priority prior to this Second Amendment.

67. More specifically, Section 4.04 of the Plan Document was amended to state:

> Effective January 1, 2024, Section 4.04 of the Plan is amended in its entirety to read as follows:
>
> Any amounts forfeited in accordance with Section 4.02 shall be first applied to reduce Company-Matching Contributions and then, if any forfeitures remain thereafter, to reduce any Profit Sharing Contributions to the Plan for the current Plan Year or the Plan Year next following the Plan Year in which the forfeiture occurred.

68. In other words, only starting in January 1, 2024, Verizon amended the Plan so that Plan forfeitures could only be used to reduce future company Plan contributions, and not used to pay Plan administrative expenses."

69. The Audited 5500 Form for the Verizon Plan for 2024 reflects this change when it states: "*Forfeited balances of terminated participants' non-vested accounts are used to reduce future employer-matching contributions and profit sharing contributions*. Forfeitures used to reduce employer-matching contributions totaled $21.3 million for the year ended December 31, 2024. At December 31, 2024 and 2023, forfeited non-vested accounts totaled $1.3 million and $1.1 million, respectively."

70. However, prior to January 1, 2024, Verizon clearly gave its Plan Committee discretion to use Plan forfeitures to pay for Plan expenses for Plan participants. Yet, they reflexively used those forfeitures solely for its own benefit.

71. During the Class Period alleged herein, each participant's account has been charged, among other things, a fixed amount of at least $23 per year for the Plan's administrative services provided by the Plan recordkeeper, Fidelity.

72. The deduction of the Plan's administrative expenses from the participants' accounts reduces the funds available to participants for distribution and/or investing, and deprives the Plan of funds that otherwise would have been earned on the amounts deducted.

73. Yet, the Plan Committee has used its discretion regarding Plan forfeitures to exclusively favor the company every single time between August 25, 2019 and December 31, 2023, by paying employer contributions rather paying Plan expenses, even though they had the discretionary choice to favor the Plan participants by paying Plan expenses which participants instead had to pay.

74. The Audited Financials to the Verizon forms have identical language in 2019-2020 and then different identical language from 2021-2023, stating how much of the Plan forfeitures were used and for what purpose. Audited Financial Statement footnotes (attached to Plan 5500 Forms), and signed by an independent third-party auditor, also provide current forfeiture year-end balance and previous year end balance for the Verizon Plan.

75. The Audited Financials to the Verizon Plan 5500 Forms from 2019 states: "*A terminated employee's non-vested employer-matching and profit sharing contributions are forfeited and offset against subsequent employer-matching and profit sharing contributions to the Plan*. Forfeitures used to reduce employer-matching contributions were $21.9 million for the year ended December 31, 2019. Outstanding forfeitures not yet applied against employer-matching were $32.1 million and $30.8 million at December 31, 2019 and 2018, respectively" (emphasis added).

76. The Audited Financials to the Verizon Plan 5500 Forms from 2020 state: "*A terminated employee's non-vested employer-matching and profit sharing contributions are forfeited and offset against subsequent employer-matching and profit sharing contributions to the Plan*. Forfeitures used to reduce employer-matching contributions were $31.8 million for the year ended December 31, 2020. Outstanding forfeitures not yet applied against employer-matching contributions were $18.4 million and $32.1 million at December 31, 2020 and 2019, respectively." (emphasis added).

77. In 2019 and 2020, even though the Plan permitted Plan forfeitures to be used to pay Plan expenses, and the Plan Committee had the discretionary ability to do so, Plan forfeitures were only used to reduce future contributions for the company and not to pay Plan expenses. Such actions by the Plan Committee only benefitted Verizon and not the Plan participants.

78. A significant change in language occurred in 2021 and continued into 2022 and 2023. Now, the Audited Financials to the Verizon Plan 5500 Forms from 2021 state: "*Forfeited balances of terminated participants' non-vested accounts are used to pay administrative expenses and to reduce future employer-matching contributions and profit sharing contributions*. Forfeitures used to pay certain administrative expenses and used to reduce employer-matching contributions totaled $36.1 million for the year ended December 31, 2021. At December 31, 2021 and 2020, forfeited non-vested accounts totaled $2.6 million and $18.4 million, respectively" (emphasis added).

79. The Audited Financials to the Verizon Plan 5500 Forms from 2022 state: "*Forfeited balances of terminated participants' non-vested accounts are used to pay administrative expenses and to reduce future employer-matching contributions and profit sharing contributions*. Forfei-

tures used to pay certain administrative expenses and used to reduce employer-matching contributions totaled $18.9 million for the year ended December 31, 2022. At December 31, 2022 and 2021, forfeited non-vested accounts totaled $1.2 million and $2.6 million, respectively" (emphasis added).

80. The Audited Financials to the Verizon Plan 5500 Forms from 2023 state: "*Forfeited balances of terminated participants' non-vested accounts are used to pay administrative expenses and to reduce future employer-matching contributions and profit sharing contributions*. Forfeitures used to pay certain administrative expenses and used to reduce employer-matching contributions totaled $17.6 million for the year ended December 31, 2023. At December 31, 2023 and 2022, forfeited non-vested accounts totaled $1.1 million and $1.2 million, respectively" (emphasis added).

**BREACH OF THE DUTY OF LOYALTY**

81. It is not clear from the language in the Audited Financials from 2021, 2022, and 2023, what percentage of forfeitures were used to "pay administrative expenses" and what percentage were used "to reduce future employer-matching contributions and profit sharing contributions."

82. However, based on the numbers from the 2019 and 2020, where the language concerning the payment of administrative expenses does not appear, it is possible to infer that all or most of the forfeitures were used to "to reduce future employer-matching contributions and profit sharing contributions."

83. The language in the Audited Financials from 2021-2023 makes clear that the Plan Committee had fiduciary discretion to use the Plan's forfeited funds for employer contributions or

to pay the Plan's administrative expenses, but used Plan forfeitures in a discretionary matter to reduce employer contributions.

84. The Plan Committee from 2019-2020 did not use forfeitures at all to reduce the Plan's administrative expenses, and it appears that they either used no Plan forfeitures to reduce the Plan's administrative expenses from 2021-2023, which would have benefitted the Plan's participants rather than Verizon.

85. The following chart shows Verizon's Plan use of forfeiture allocations through December 31, 2023, until the time of the Second Amendment to the Plan Document:

**Forfeitures Used for Employer's Benefit**

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| **Forfeitures Used to Reduce Employer** | $21,900,000 | $31,800,000 | $36,100,000 | $18,900,000 | $17,600,000 | |
| *Compounding Percentage (Plan Return)* | | *13.40%* | *13.41%* | *-17.39%* | *15.33%* | *13.17%* |
| **Potential Cumulative Compounded Losses** | **$21,900,000** | **$56,635,438** | **$100,330,650** | **$101,781,214** | **$134,983,023** | **$152,754,683** |
| **Sources:** | 2019 Form 5500, Page 35 of 49 | 2020 Form 5500, Page 34 of 49 | 2021 Form 5500, Page 34 of 49 | 2022 Form 5500, Page 34 of 49 | 2023 Form 5500, Page 35 of 48 | 2024 Form 5500, Page 37 of 49 |

86. Using the forfeitures to reduce future employer contributions is usually, but not always, in the best interest of Verizon because that option decreases Verizon's own contribution costs and means that Verizon does not need to take money out of its own general revenues to pay for Plan contributions.

87. The option to reduce future employer contributions is not always in Verizon's best interest and may be in the best interests of Plan participants where there is a risk that Verizon may be financially unable to satisfy its contribution obligations.

88. Absent a risk that Verizon would be unable to satisfy its contribution obligations under the Verizon Plan, however, using forfeitures to "pay Plan expenses" would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such administrative expenses.

89. Here, based on the amount of profit Verizon generated in the tens of billions of dollars per year from 2019-2023, there existed no reason why Verizon could not satisfy its contribution obligations without Plan forfeitures.

90. In deciding between using the forfeitures to benefit Verizon or using the forfeitures to benefit the participants, Defendants are presented with a conflict of interest in administering the Plan and managing and disposing of their assets.

91. In using Plan forfeitures solely to reduce its own employer contributions from 2019-2023, even though it was permitted to use those Plan forfeitures to pay administrative expenses for participants, Verizon was motivated solely by self-interest.

**ERISA'S DUTY OF PRUDENCE AS APPLIED TO FORFEITED PLAN ASSETS**

92. Well prior to the Class Period, like all prudent defined contribution plan fiduciaries and plan sponsor/employers/settlors, the Plan Committee knew that a defined contribution "plan will not be qualified unless all funds are allocated to participants' accounts in accordance with a definite formula in the plan." *See also*, IRS "Retirement News for Employers," Vol. 7, at 4, Spring 2010 (citing to IRS Revenue Ruling 80-155).

93. Similarly, all prudent defined contribution plan fiduciaries and employers knew that to ensure their plans remained qualified under the IRC, there were only a few allowable uses of forfeited plan assets, primary among them being to defray plan expenses or reduce employer contributions. *Id*.

94. Accordingly, when designing their plan, employers had a few limited options to choose from with respect to the treatment of forfeited plan assets. Employers that wanted all forfeited plan assets to be used first to reduce employer contributions prior before defraying plan

expenses could have drafted the terms of the plan to explicitly require that or write out plan expenses completely (as Verizon eventually did effective January 1, 2024).

95. Like Verizon, several other large plan sponsors drafted their plans to specifically require forfeited plan assets to be used to offset the employer's matching and discretionary contributions before being used to defray plan expenses, while others even prohibited using forfeited plan assets to defray plan expenses.

96. On the opposite end of the spectrum, some plans preclude or limit forfeited plan assets from being used to reduce employer contributions.

97. In between these two poles are plans—like the Plan here before January 1, 2024—that accord discretion to their fiduciaries to use forfeited plan assets either to defray plan expenses or to offset employer contributions. In those instances, plan fiduciaries, as with any exercise of discretion over the use of plan assets, must use a prudent process to determine which of the allowable uses of forfeited plan assets would be consistent with their fiduciary duties.

98. A plan fiduciary that exercises discretion to use forfeited plan assets to defray plan expenses is not providing a benefit greater than what was required or intended by the plan sponsor/employer (settlor).

99. Rather, plans that grant discretion to plan fiduciaries to choose among multiple different options for allocating forfeited plan assets, including to defray plan expenses, necessarily contemplate that plan expenses will be defrayed if doing so accords with ERISA's fiduciary standards.

100. Critically, when a plan sponsor/employer makes a decision to make a discretionary employer contribution, it is acting as a settlor and not in a fiduciary capacity with respect to the plan, and is therefore free to prioritize its own interests over those of the plan and its participants.

101. In contrast, a plan fiduciary making fiduciary decisions based on the discretion granted by the plan sponsor/employer is explicitly prohibited by ERISA from considering the interest of the employer.

102. There is no dispute that under the terms of the Plan, defraying plan expenses was an allowable use of Plan forfeitures prior to January 1, 2024.

103. The terms of the Plan require the Plan Committee to exercise its discretion related to the use of Plan forfeitures prior to January 1, 2024, and determine whether defraying Plan Expenses was more consistent with its duties under the Plan and ERISA than using Plan forfeitures to offset employer contributions.

104. Accordingly, from the beginning of the Class Period through December 31, 2023, a prudent fiduciary as part of a prudent fiduciary process would have always considered whether using Plan forfeitures to defray Plan Expenses was more consistent with their duties under the plan and ERISA than using Plan forfeitures to offset Company Contributions.

105. As set forth in detail below, the facts and circumstances here support a finding that, from the beginning of the Class Period through December 31, 2023, a prudent fiduciary of the Verizon Plan employing a prudent process would have chosen to use Plan forfeitures to defray some or all Plan Expenses during the class period.

106. In its Retirement News for Employers Newsletter from Spring 2010, the IRS published an article entitled "*Fixing Common Plan Mistakes: Improper Forfeiture Suspense Accounts*," discussing IRS Publication 4278-B (2010), p4278.pdf (irs.gov).

107. In pertinent part, that article states: "Forfeitures must be used or allocated in the plan year incurred. The Code does not authorize forfeiture suspense accounts to hold unallocated monies beyond the plan year in which they arise. Revenue Ruling 80-155 states that a defined

contribution plan will not be qualified unless all funds are allocated to participants' accounts in accordance with a definite formula defined in the plan. This would preclude a plan from carrying over Forfeited Plan Assets to subsequent plan years, as doing so would defy the rule requiring all monies in a defined contribution plan to be allocated annually to plan participants."

108. The same article states that "[t]he plan document's terms should have provisions detailing how and when a plan will exhaust plan forfeitures. A plan's failure to use forfeitures in a timely manner denies plan participants additional benefits or reduced plan expenses."

109. The IRS concludes that "this failure can be corrected by reallocating all forfeitures in the plan's forfeiture suspense account to all plan participants who should have received them had the forfeitures been allocated on time."

110. ERISA's fiduciary duty of prudence is violated where, as here, the Plan Committee faced with a decision, from the beginning of the Class Period through December 31, 2023, in choosing between allocating Plan forfeitures toward offsetting employer contributions or defraying Plan expenses that would otherwise be borne by Plan participants, failed to conduct any investigation as to which choice would be in the best interest of the participants.

111. If the Plan Committee had employed a prudent process from the beginning of the Class Period through December 31, 2023, the Plan Committee would have used the Plan forfeitures to defray some or all Plan expenses.[5]

[5] In other words, to the extent that the Plan forfeitures exceeded the foreseeable future ongoing Plan expenses as evaluated ***solely*** in the interest of Plan participants and for the exclusive purpose of providing benefits to participants ***and*** defraying the Plan expenses, then the Plan forfeitures can be used to offset the full amount of Verizon's declared Plan contributions. Defendants are solely in the possession of the documents that would be necessary to review and evaluate that determination.

112. In fact, however, the Plan Committee allocated none of the Plan forfeitures to defray Plan expenses from the beginning of the Class Period through December 31, 2023.

113. In other words, the Plan Committee imprudently coordinated with Verizon and the Plan's recordkeeper to calculate how much of the Plan forfeitures would be used to offset Verizon employer contributions, while allowing Plan expenses to be deducted from the accounts of Plan participants, like Plaintiffs.

114. Because the Plan Committee always had the ability to defray Plan expenses with Plan forfeitures from the beginning of the Class Period through December 31, 2023, but never did so, it is reasonable to infer that the Plan Committee employed a flawed decision-making process or did not employ any process at all to determine how to allocate Plan forfeitures during this time period.

115. The Plan Committee did not, for example, investigate whether there was any set of circumstances that would support a decision to reduce Verizon's Plan contributions prior to defraying Plan expenses, and there are no facts or circumstances that could possibly make the Plan Committee's failure to use Plan forfeitures to defray Plan expenses prudent.

116. ***First***, there is no indication that using Plan forfeitures to offset employer contributions was necessary to maintaining those contribution levels, as there are no facts or circumstances to suggest that Verizon's process in determining the amount of its Plan contributions is based on any consideration of the amount of Plan forfeitures.

117. In fact, just like all other companies that have discretionary contribution provisions, from the beginning of the Class Period through December 31, 2023, Verizon's decisions related to employer contributions were made without reference to the amount of Plan forfeitures and were instead driven by the need to attract and retain talented employees.

118. Companies like Verizon actually use their past benefit history to both attract new employees and promote to their existing employees the benefits provided by the plan design even if those benefits are discretionary.

119. On the other hand, Plan administrative expenses are immaterial to both Verizon's decision to provide a discretionary employer contribution, as well as to Verizon's financial results.

120. Similarly, just like virtually all other companies that offer a discretionary profit sharing provision in their plan, Verizon's decision to make a Profit Sharing Contribution is based both on its competitive need to attract and retain talented employees as well as the financial condition of the company. The amount of Verizon's Profit Sharing Contribution rate is calculated as a percent of the total compensation of eligible employees and is made without any regard to the amount of Plan forfeitures held in (or expected to be in) an unallocated plan account at the time (often six to nine months in the future) the discretionary employer contributions are made.

121. While Verizon's Plan contributions are initially discretionary and are made annually, typically around six months after the end of the prior plan year (but in all cases on or before December 31st of the Plan Year following the Plan Year to which the contributions relate), Verizon typically makes the settlor decision about the amount of the its employer contributions sometime in the fourth quarter of the Plan year.

122. At this point, the Plan Committee knows the exact amount of declared employer contributions and only makes fiduciary decisions with respect to Plan assets based on the actual employer contributions declared by Verizon *i.e.*, the circumstances then prevailing. Therefore, it is irrelevant for the Plan Committee's decision-making process with respect to the allocation of Plan forfeitures that the employer contributions were ever once discretionary.

123. ***Second***, there are no facts to suggest that Verizon would be unable to meet its future Plan contribution obligations, such that using Plan forfeitures to offset employer contributions was necessary from the beginning of the Class Period through December 31, 2023.

124. Upon information and belief, Verizon was able to meet its future contributions from the beginning of the Class Period through December 31, 2023, and would have been able to meet its declared employer contributions each year, even if no Plan forfeitures were applied to offset its contributions.

125. In fact, from 2019 to 2024, Verizon's annual revenue has ranged from approximately $128.29 billion to $136.84 billion. In turn, Verizon's profit over the last six years varied, with net income varying between $11.6 billion (2021) and $21.3 billion (2023). On the other hand, the amount of Plan forfeitures from the beginning of the Class Period through December 31, 2023, required to defray Plan expenses would have comprised around 0.05% of the Company's operating profit each year during that period.

126. Yet even if there was some indication that Verizon would be unable to meet future employer contribution obligations from the beginning of the Class Period through December 31, 2023, a prudent fiduciary would only offset the amount necessary to prevent Verizon from being unable to meet its future contributions, and then allocate the remaining funds to other more beneficial options, like reducing plan expenses shouldered by the Plan participants.

127. Consequently, an objective analysis of the available options from the beginning of the Class Period through December 31, 2023, guided by ERISA's fiduciary duty of prudence would indisputably not result in Plan fiduciaries choosing to use nearly all Plan forfeitures available to offset future employer contributions during that period instead of using Plan forfeitures to defray some or all Plan expenses borne by Plaintiffs and other Plan participants.

128. Instead of acting prudently by using Plan forfeitures to defray Plan expenses charged to the individual accounts of Plan participants on an ongoing basis, the Plan Committee chose to use all the Plan forfeitures for the exclusive purpose of offsetting Verizon's employer contributions to the Plan, thereby saving Verizon tens of millions of dollars at the expense of the Plan.

129. Defendants should have used the fiduciary discretion granted to it prior to January 1, 2024, to pay Plan expenses of Plan participants. Defendants' contrary fiduciary decision with regard to the Verizon Plan forfeitures cost the Plan's participants over $49 million dollars from 2019 through 2023:

**Failure to Use Forfeited Plan Assets to Defray Reasonable Plan Expenses**

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| Plan Expenses via Direct Comp | $7,183,910 | $8,083,490 | $7,901,743 | $9,430,580 | $7,512,672 | |
| Available Forfeitures | $54,000,000 | $18,100,000 | $20,300,000 | $17,500,000 | $17,500,000 | |
| **Forfeitures Not Used to Defray Reasonable Plan Expenses** | **$7,183,910** | **$8,083,490** | **$7,901,743** | **$9,430,580** | **$7,512,672** | |
| Compounding Percentage (Plan Return) | | 13.40% | 13.41% | -17.39% | 15.33% | 13.17% |
| **Compounded for Lost Earnings** | **$7,183,910** | **$16,230,319** | **$26,308,662** | **$31,163,658** | **$43,453,336** | **$49,174,336** |

130. While Defendants' reallocation of the forfeitures in the Plan's trust funds to reduce its future contributions benefitted Verizon by reducing its own contribution expenses and allowing it not to take additional monies out of its general revenues or corporate treasury, it harmed the Verizon Plan, along with its participants and beneficiaries, by reducing future Company contributions that would otherwise have increased Plan's assets and by causing participants to incur deductions of administrative expenses from their individual accounts.

131. Defendants received a benefit while participants simply received that which they would have received anyway, while remaining on the hook for paying their share of the Plan's administrative expenses.

132. Prudent fiduciaries following a prudent process would not choose to offset Verizon's declared employer contributions instead of reducing the Plan participants' Plan expenses.

133. The Plan Committee's conduct from the beginning of the Class Period through December 31, 2023, at the very least, necessitates the inference that either it did not have processes in place to weigh the benefits to participants of allocating Plan forfeitures or, alternatively, the process employed was fatally flawed.

134. While Defendants' decisions to use the Plan's forfeitures to reduce its outstanding and unpaid contributions benefitted Verizon by lowering its costs, it harmed the Plan, along with its participants and beneficiaries, by reducing the amount of assets the Plan otherwise would have received and by causing deductions from participants' accounts to cover expenses that otherwise would have been covered in whole or in part by the Plan's forfeitures.

**FAILURE TO USE UNALLOCATED FORFEITED PLAN ASSETS**

135. The Plan Committee was required to monitor Plan forfeitures and should have ensured that all Plan forfeitures for the plan year were promptly exhausted by year end or shortly thereafter, and did not remain in an unallocated Plan account.

136. Even though there were sufficient unallocated Plan forfeitures to defray some or all of the Plan's expenses from the beginning of the Class Period through December 31, 2023, the Plan Committee nevertheless chose to allow the unallocated Plan forfeitures in each of those years to remain unused.

137. A prudent fiduciary employing a prudent process would at a minimum of once a year, coordinate with the Plan's recordkeeper to determine the amount of unallocated Plan forfeitures available.

138. To the extent there were unallocated Plan forfeitures, a prudent fiduciary would evaluate how to use the unallocated Plan forfeitures solely in the interest of the participants and beneficiaries. *See* 29 U.S.C. § 1104(a)(1).

139. The Plan Committee, following a prudent process, would not have allowed millions in Plan forfeitures to accumulate in an unallocated plan level account when the Plan's terms gave Plan fiduciaries from the beginning of the Class Period through December 31, 2023, the discretion to use Plan forfeitures to defray Plan expenses, especially when the amount of the Plan forfeitures that remained at the end of each calendar year were significantly greater than the amount of Plan expenses each year of the class period.

140. The Plan Committee, did not, for example, investigate whether there was any set of circumstances that would support a decision to not use unallocated Plan forfeitures to defray Plan expenses and allow millions of Plan assets to go unused.

141. The Plan Committee's repeated practice of failing to allocate Plan forfeitures show that the Plan Committee either had no prudent process in place to determine how to use Plan forfeitures or, alternatively, employed a flawed process.

142. The Plan Committee violated its fiduciary duty of prudence by not using unallocated Plan forfeitures, thereby causing Plaintiffs and other Plan participants to pay for tens of millions in Plan expenses that should have otherwise been defrayed from the beginning of the Class Period through December 31, 2023.

143. Defendants violated their fiduciary duty of prudence by not using their forfeiture suspense account as instructed by the Plan and the IRS, thereby causing Plaintiffs and other of the Plan's members to be denied additional benefits and/or reduced Plan expenses.

144. As shown in the chart below, Plaintiffs seek $7.5 million in losses from 2019-2023, caused by Defendants' imprudence in failing to exhaust Plan forfeiture suspense accounts in a timely manner at the end of each year:

**Forfeiture End of Year Balances**

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|
| **Forfeiture Balance EOY** | $32,100,000 | $18,400,000 | $2,600,000 | $1,200,000 | $1,100,000 | |
| **Forfeiture Annual Losses** | $0 | $4,302,628 | $2,467,570 | -$452,190 | $183,945 | |
| *Compounding Percentage (Plan Return)* | | *13.40%* | *13.41%* | *-17.39%* | *15.33%* | *13.17%* |
| **Potential Cumulative Compounded Losses** | **$0** | **$4,302,628** | **$7,347,211** | **$5,617,199** | **$6,662,192** | **$7,539,326** |
| **Sources:** | 2019 Form 5500, Page 35 of 49 | 2020 Form 5500, Page 34 of 49 | 2021 Form 5500, Page 34 of 49 | 2022 Form 5500, Page 34 of 49 | 2023 Form 5500, Page 35 of 48 | 2024 Form 5500, Page 37 of 49 |

145. To be clear, as described above, Plaintiffs do not allege that ERISA prohibits fiduciaries from *ever* using Plan forfeitures to offset employer contributions. Rather, Plaintiffs allege that under the specific facts and context of this Plan—where the Plan Committee was accorded discretion by the Plan over how to allocate Forfeited Plan Assets from the beginning of the Class Period through December 31, 2023—a prudent fiduciary would not make the decisions that the Plan Committee made (as alleged above). Here, under the circumstances described, it is reasonable to infer that the Plan Committee did not employ a prudent fiduciary decision-making process and thus breached their fiduciary duty of prudence. *See e.g., Sacerdote v. N.Y. Univ.,* 9 F.4th 95, 108-09 (2d Cir. 2021) ("[We] caution against overreliance on . . . other ERISA cases as benchmarks. While such comparisons may sometimes be instructive, their utility is limited because the assessment of any particular complaint is a context-specific task. We cannot rule out the possibility that a fiduciary has acted imprudently by including a particular fund even if, for example, the fees that fund charged are lower than a fee found not imprudent in another case.").

146. In summary, the totality of the specific facts and circumstances of the Plan and the conduct of the Plan Committee throughout the class period demonstrates that the Plan Committee failed to administer the Plan in a prudent manner with regard to management of Plan forfeitures.

**PROHIBITED TRANSACTIONS**

147. ERISA's prohibited-transaction provisions impose "categorical" restrictions designed to protect plan assets from conflicted, insider transactions. *See Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000).

148. Section 406(a) prohibits fiduciaries from causing a plan to engage in certain transactions with parties in interest, including any "transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(D).

149. Section 406(b) separately prohibits fiduciaries from "deal[ing] with the assets of the plan in [their] own interest," id. § 1106(b)(1), or "act[ing] in a transaction" involving plan assets "on behalf of a party… whose interests are adverse to the interests of the plan," id. § 1106(b)(2).

150. *Cunningham v. Cornell University*, 604 U.S. 693 (2025), reinforces that ERISA § 406(a) imposes "categorical" prohibitions on certain transactions and that plaintiffs need only plead the statutory elements of § 406(a)(1) to state a claim. *Id.* at 700.

151. *Cunningham* makes clear that § 1106(a)(1)'s prohibitions apply whenever a fiduciary causes a plan to engage in a transaction falling within the statutory language. Although *Cunningham* did not address the meaning of "use" under § 406(a)(1)(D) or the application of forfeitures to reduce employer contributions, those questions are resolved by the growing body of forfeiture-specific cases, many of which hold that a fiduciary "uses" plan assets for the employer's

benefit when it applies forfeitures to reduce employer contributions—even where no funds leave the plan trust.

152. When a fiduciary applies forfeitures in a manner that relieves the employer of a financial obligation, the fiduciary has engaged in a prohibited "use" of plan assets, even without a literal transfer of funds.

153. An employer's reallocation of undisputed plan assets to reduce its own matching contribution is a 'use' of plan assets for the purposes of § 1106(a)(1)(D). This is because allocating forfeitures to reduce employer contributions is not an internal bookkeeping measure—it is a disposition of plan assets that directly benefits the employer.

154. A party in interest includes an employer whose employees are covered by the plan. 29 U.S.C. § 1002(14)(C).

155. Verizon saved millions of dollars in employer contributions by using forfeitures to satisfy obligations it otherwise would have paid from corporate funds.

156. That is a direct "transfer to" or "use for the benefit of" a party in interest under § 406(a)(1)(D).

157. The allocation of forfeitures to reduce employer contributions necessarily reduces the employer's financial obligation to the Plan. Forfeiture allocation operates "between" the plan and employer because it alters the employer's contribution obligations, violates § 406(a)(1)(D).

158. Similarly, Section 406(b)(1) bars a fiduciary from "deal[ing] with the assets of the plan in his own interest," and § 406(b)(2) prohibits a fiduciary from acting for the benefit of a party adverse to participants. Plaintiffs allege that Meijer acted in both capacities—first, as fiduciary allocating forfeitures, and second, as employer who benefitted directly from that allocation.

159. A fiduciary breaches § 406(b) when it uses plan assets in a manner that relieves the employer of financial obligations.

160. Because Verizon's allocation decisions relieved itself of substantial financial obligations while providing no corresponding benefit to Plan participants, prohibited self-dealing exists under § 406(b).

161. Reducing employer contributions is not merely an "intra-plan transfer" and is a "transaction" under § 406.

162. An intra-plan movement of assets constitutes a prohibited transaction if it: (1) involves plan assets; (2) benefits a party in interest or fiduciary; and (3) results from a fiduciary decision.

163. Verizon caused plan assets to be used to reduce its own contribution obligations. That is "dealing with" and "using" plan assets in a manner § 406 squarely prohibits, and thus, Verizon engaged in transactions prohibited by both § 406(a) and § 406(b).

## CLASS ACTION ALLEGATIONS

164. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

165. In acting in his representative capacity for the Verizon Plan, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Verizon Plan.

166. Plaintiffs seek to certify, and to be appointed as representative of, the following Class:

> All participants and beneficiaries of the Verizon Savings Plan for Management Employees (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning August 25, 2019, and running through December 31, 2023.

167. The Class includes approximately 125,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

168. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Verizon Plan and took the actions and omissions alleged as to the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

a. Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b. Whether Defendants breached their fiduciary duties to the Plan and engaged in prohibited transactions;

c. What are the losses to the Plan resulting from each breach of fiduciary duty and prohibited transaction; and

d. What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty and prohibited transactions.

169. Plaintiffs' claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were a participant of the Verizon Plan during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

170. Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were participants in the Plan during the Class period, have no interests that conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

171. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to

the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

172. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

173. Plaintiffs' attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

174. The claims brought by the Plaintiffs arise from fiduciary breaches and prohibited transactions as to the Plan in its entirety and do not involve mismanagement of individual accounts.

175. The claims asserted on behalf of the Plan in this case fall outside the scope of any exhaustion language in the individual participants' Plan.

176. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of the Plan for breaches of fiduciary duty or for prohibited transactions.

177. Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the plan.

178. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan's Administrator) are the same individuals that made the decisions that are at issue

in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a plan administrator's decisions – does not exist here because courts will not defer to plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breach of Duty of Loyalty**
**Plaintiffs, on behalf of themselves and Class, Against Plan Committee**
**(Misallocation of Plan's Forfeitures)**

179. Plaintiffs restate the above allegations as if fully set forth herein.

180. Defendant Plan Committee is a fiduciary of the Verizon Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

181. Pursuant to 29 U.S.C. § 1104(a)(1)(A), Defendant Plan Committee was required to discharge its duties to the Verizon Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

182. Defendant Plan Committee has continually breached this duty of loyalty with respect to their control and management of the Verizon Plan's assets throughout the Class Period by choosing to utilize forfeited funds in the Plan for the exclusive benefit of Verizon rather than solely in the interest of the Plan's participants and beneficiaries.

183. Instead of acting solely in the interest of the Plan's participants by utilizing forfeited funds in the Plan to reduce or eliminate Plan expenses, Defendant Plan Committee chose to use the Plan's assets for the exclusive purpose of reducing Verizon's contributions to the Plan, thereby saving Verizon tens of millions of dollars at the expense of the Plan and their participants, who were forced to incur avoidable Plan expense deductions to their individual accounts.

184. In making these Plan forfeiture decisions, Defendant Plan Committee was motivated primarily or exclusively by their own self-interest rather than the interests of the Plan's participants and beneficiaries, in violation of ERISA's fiduciary duty of loyalty.

185. As a direct and proximate result of Defendant Plan Committee's fiduciary breaches described herein, the Plan suffered injury and loss for which they are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of loyalty.

**SECOND CLAIM FOR RELIEF**
**Breach of Duty of Prudence**
**Plaintiffs, on behalf of themselves and Class, Against Plan Committee**
**(Misallocation of Plan Forfeitures)**

186. Plaintiffs restate the above allegations as if fully set forth herein.

187. Pursuant to 29 U.S.C. § 1104(a)(1)(B), Defendant Plan Committee was required to discharge their duties with respect to the Verizon Plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

188. Defendant Plan Committee has continuously breached their duty of prudence under 29 U.S.C. § 1104(a)(1)(B) throughout the Class Period by declining to use the forfeited funds in the Plan to eliminate or reduce the Plan expenses charged to participant accounts, and instead used the Plan's forfeitures to reduce Verizon's contributions to the Plan.

189. In deciding how to allocate forfeitures, Defendant Plan Committee utilized an imprudent and flawed process. Despite the conflict of interest presented by their forfeitures allocation decisions, Defendant Plan Committee failed to undertake any reasoned and impartial decision-making process to determine whether using the forfeited funds in the Plan to reduce the Company's

own contributions, as opposed to the Plan expenses charged to participant accounts, was prudent, and failed to consider whether participants would be better served by another use of these forfeiture assets after considering all relevant factors.

190. By refusing to use forfeited funds in the Plan to eliminate or reduce the Plan expenses charged to participant accounts, and instead deciding to use the Plan's forfeiture to reduce Verizon's own contributions to the Plan, Defendant Plan Committee caused the Plan to receive fewer contributions that would otherwise have increased Plan's assets and caused participants to incur expense deductions from their individual accounts that would otherwise have been covered in whole or in part by utilizing the forfeited funds to pay Plan expenses, as discretionarily permitted under the Plan Document.

191. Defendant Plan Committee also breached their duty of prudence by failing to follow the Verizon Plan itself, as well as IRS guidance, both of which make clear that the Verizon Plan should have allocated all of the Plan's forfeitures by the end of each Plan year.

192. On December 31st of each year, the Plan forfeitures that accrued throughout the prior calendar year become outstanding and unpaid amounts owing to the Plan.

193. Both the Plan's language and IRS guidance make clear that Verizon was required to monitor plan forfeitures and exhaust such forfeitures on a yearly basis. If a suspense account is used, as it was with the Verizon Plan, then Verizon should have ensured that all forfeitures for the Plan years were promptly exhausted by year end or close to year end.

194. Defendant Plan Committee violated their fiduciary duty of prudence by not using their forfeiture suspense account as instructed by the Plan and the IRS, thereby causing Plaintiffs and other of the Plan's members to be denied additional benefits and/or reduced Plan expenses.

195. As a direct and proximate result of Defendants' fiduciary breaches described herein, the Plan suffered injury and loss for which Defendants are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of prudence.

**THIRD CLAIM FOR RELIEF**
**Fiduciary Prohibited Transactions**
**Plaintiffs, on behalf of themselves and Class, Against Plan Committee**
**(Self-Dealing with Forfeitures)**

196. Plaintiffs restate the above allegations as if fully set forth herein.

197. 29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not," among other things, "deal with the assets of the plan in his own interest or for his own account."

198. Defendant Plan Committee violated this prohibition in its management and control of forfeitures in the Plan. By allocating these Plan's assets toward reducing Verizon's contributions owing to the Plan, thereby saving Verizon tens of millions of dollars in contribution expenses from their own corporate treasury, Defendant Plan Committee dealt with the assets of the Plan in Verizon's own interest and for their own account.

199. Defendant Plan Committee's reallocation of plan assets to reduce Verizon's own contribution is a 'use' of plan assets for the purposes of § 1106(a)(1).

200. As a result of this prohibited conduct, Defendant Plan Committee caused the Plan to suffer losses in the amount of the Plan's assets that were substituted for employer contributions and the lost investment returns on those assets.

201. Each member of the Defendant Plan Committee is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited

conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan's assets and is subject to other equitable or remedial relief as appropriate.

**FOURTH CLAIM FOR RELIEF**
**Party-In-Interest Prohibited Transactions**
**Plaintiffs, on behalf of themselves and Class, Against Plan Committee**
**(Benefitting Employer)**

202. Plaintiffs restate the above allegations as if fully set forth herein.

203. 29 U.S.C. § 1106(a)(1)(D) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect - transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

204. Defendant Plan Committee, as fiduciaries of the Verizon Plan, caused the Plan to engage in a transaction that used the assets of Plan for the benefit of a party in interest, Verizon, by using Plan's forfeitures to reduce the future employer contributions of Verizon during the Class Period.

205. Defendant Plan Committee's reallocation of plan assets to reduce its own contribution is "dealing with" plan assets for the purposes of § 1106(b)(1).

206. By allocating Plan forfeitures to be used for the benefit of reducing future employer contributions, Defendant Plan Committee misused tens of millions of dollars of Plan forfeitures which could have been reallocated instead to pay Plan expenses.

207. Each member of the Defendant Plan Committee is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan's assets and is subject to other equitable or remedial relief as appropriate.

**FIFTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**Plaintiffs, on behalf of themselves and Class, Against Defendants Company and Board**
**(Misallocation of Forfeitures and Self-Dealing)**

208. Plaintiffs restate the above allegations as if fully set forth herein.

209. Defendants Verizon and Board had the authority to appoint and remove members or individuals responsible for the Plan's forfeitures and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

210. In light of this authority, Defendants Verizon and Board had a duty to monitor those individuals responsible for the Plan's forfeitures on the Plan Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Verizon Plan in the event that these individuals were not fulfilling those duties.

211. Defendants Verizon and Board had a duty to ensure that the individuals responsible for the Plan's forfeitures on the Plan Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Verizon Plan's forfeitures; and reported regularly to Defendants.

212. The objectively disloyal, imprudent, and conflicted manner in which Defendants Verizon and Board handled the Plan's forfeitures inferentially establish that Defendants Verizon and Board breached their duty to monitor by, among other things:

a. Failing to monitor and evaluate the performance of individuals responsible for the Plan's forfeitures on the Plan Committee or have a system in place for doing so, standing idly by as the Verizon Plan misallocated the Plan's forfeiture for Verizon's benefit;

b. Failing to monitor the process by which individuals responsible for the Plan's forfeitures were evaluated and failing to investigate the proper use of Plan's forfeitures; and

c. Failing to remove individuals responsible for Plan forfeitures on the Plan Committee whose performance was inadequate in that these individuals continued to misallocate Plan forfeitures for the benefit of Verizon.

213. As the consequences of the breaches of the duty to monitor for the Plan's forfeitures, the Plaintiffs and the Plan's participants suffered tens of millions of dollars of objectively unreasonable and unnecessary monetary losses.

214. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants Verizon and Board are liable to restore to the Verizon Plan all losses caused by their failure to adequately monitor individuals responsible for the Plan's forfeitures on the Plan Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that the Defendants have breached their fiduciary duties and engaged in prohibited transactions under ERISA;

D. An Order compelling the Defendants to make good to the Verizon Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty and prohibited transactions, including restoring to the Plan all losses resulting from misallocation of Plan forfeitures, and restoring to the Plan all profits the Defendants made through use of the Verizon Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations and not engaged in prohibited transactions;

E. An Order requiring Verizon to disgorge all profits received from, or in respect of, the Verizon Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Verizon as necessary to effectuate relief, and to prevent Verizon's unjust enrichment;

F. An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties or from engaging in prohibited transactions;

G. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary to administer the Verizon Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties or engaged in prohibited transactions;

H. An award of pre-judgment interest;

I. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J. Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Date: November 21, 2025

**CHIRINOS LAW FIRM, PLLC**

*/s/ Nicole M. Cvercko*
Nicole M. Cvercko, Bar No. 6050629
11 Broadway, Suite 615
New York, NY 10004
646-559-9952
Email: ncvercko@gmail.com

Tulio D. Chirinos (admitted *pro hac vice*)
20283 State Road 7
Boca Raton, FL 33498
Telephone: 561-299-6334
Email: tchirinos@chirinoslawfirm.com

**WALCHESKE & LUZI, LLC**

Paul M. Secunda (admitted *pro hac vice*)
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372
Email: psecunda@walcheskeluzi.com

*Attorneys for Plaintiffs and Proposed Class*